Jimmy GRIFFIN

v.

OPI INTERNATIONAL, INC., Offshore
Pipelines, Inc., and OPI International
Vessels, Ltd.

v.

NORTH BANK TOWING
CORPORATION and
Smith Towing, Inc.

Civ. A. No. G–94–083.

United States District Court,
S.D. Texas,
Galveston Division.

March 24, 1995.

Ernest H. Cannon, Ernest Cannon & Associates, Houston, TX, Joseph L. Waitz, Waitz & Downer, Houma, LA, for Jimmy J. Griffin.

Chris A. Lorenzen, Crain, Caton & James, Houston, TX, for OPI Intern., Inc., OPI Intern. Vessels, Ltd., Inc. Offshore Pipelines.

Ronald L. White, Brown Sims Wise & White, Houston, TX, for North Bank Towing Corp.

Ronald L. White, Innes Mackillop, Brown Sims Wise & White, Houston, TX, for Smith Towing, Inc.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KENT, District Judge.

The above cause came on for non-jury trial on February 13, 1995 and concluded on February 14, 1995, the Honorable Samuel B. Kent, presiding. The Court, having carefully considered the oral testimony of all witnesses presented live at trial, the deposition transcript of each witness proffered in that format, all exhibits tendered during the course of the trial, all pleadings heretofore filed in the case, all Summary Judgment materials of the OPI Defendants and of North Bank Towing Corporation, the Joint Pretrial Order and attachments, the statements and arguments of counsel for their respective clients made throughout the course of the trial and the Proposed Findings of Fact and Conclusions of Law submitted by the OPI Defendants as well as by NORTH BANK TOWING CORPORATION and SMITH TOWING, INC., and on the basis of a preponderance of the evidence and pursuant to Rule 52(a) of the Fed.R.Civ.Proc., hereby enter its Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Plaintiff, JIMMY JOSEPH GRIFFIN, commenced this suit in early 1994, asserting two (2) barge-related personal injuries, the first occurring on November 29, 1991 and the second occurring on November 10, 1992. Timely responsive pleadings were thereafter filed by Defendants, OPI INTERNATIONAL, INC., OFFSHORE PIPELINES, INC. and OPI INTERNATIONAL VESSELS, LTD. (hereinafter sometimes referred to as the "OPI Defendants" or simply "OPI"). Plaintiff's claims against the OPI Defendants' individual claims were alleged under the Jones Act, 46 U.S.C. App. § 688 and the general maritime law. Plaintiff's claims against Defendant, SMITH TOWING, INC. were alleged under the general maritime law. The Third–Party claims of the OPI Defendants as well as the Cross/Counterclaims of SMITH TOWING, INC. and NORTH BANK TOWING CORPORATION were alleged under the general maritime law. The Plaintiff chose to proceed under Rule 9(h), Fed.R.Civ.Proc. and requested a non-jury trial.

The Court has admiralty and maritime jurisdiction over all claims of the Plaintiff pursuant to 28 U.S.C. § 1332. Venue was contested by the OPI Defendants, but was properly maintained in this District and Division.

2. Thereafter, at various times, both the Plaintiff and the OPI Defendants sought

leave to add NORTH BANK TOWING CORPORATION (hereinafter "NORTH BANK") and SMITH TOWING, INC. (hereinafter "SMITH TOWING") as Defendants and Third–Party Defendants, respectively. These Motions were granted and timely responsive pleadings were then filed by those entities in respect of both the Plaintiff's Amended Complaints and the OPI Defendants' Third–Party Original and Amended Complaints.

3. The OPI Defendants' Third–Party Complaints against NORTH BANK sought contractual indemnity pursuant to a Charterparty dated September 9, 1992 between OPI INTERNATIONAL, INC. and NORTH BANK relative to a towing vessel known as the M/V MISS PATRICIA. Alternatively, the OPI Defendants sought contribution from NORTH BANK.

4. The OPI Defendants' Third–Party Complaints against SMITH TOWING sought tort contribution. NORTH BANK counterclaimed and SMITH TOWING cross-claimed against the OPI Defendants seeking tort contribution.

5. The Court has jurisdiction over all claims between the OPI Defendants, NORTH BANK and SMITH TOWING pursuant to 28 U.S.C. § 1333.

6. Shortly before trial, Plaintiff dismissed NORTH BANK as a direct defendant from this suit. In addition, the OPI Defendants filed a Motion for Summary Judgment against NORTH BANK relative to the Charterparty indemnity issues. NORTH BANK responded and filed a Cross–Motion for Summary Judgment on the same issues. The Court overruled both Motions by its Order of February 6, 1995 for reasons more particularly set forth therein (and which will be discussed further below).

7. During the first day of trial on February 13, 1995, and after having heard the direct testimony of Jimmy Griffin, the Plaintiff's case against the OPI Defendants and against SMITH TOWING was settled for the combined sum of $850,000.00 with each party to bear their respective costs of court. The Court finds that the amount of this settlement was fair and reasonable. The OPI Defendants, on the one hand, and NORTH BANK/SMITH TOWING, on the other hand, agreed to fund the Plaintiff's settlement on a 50%/50% basis "without prejudice" and with full reservation of rights against one another relative to all liability issues including contractual indemnity and tort contribution. The trial thereafter proceeded with particular focus on these issues.

8. At the time of his first injury on November 29, 1991, Plaintiff GRIFFIN was employed by OPI INTERNATIONAL, INC. as a "Jones Act" seaman onboard the L/B PIPELINER V ("Barge") which was owned and operated by OPI INTERNATIONAL, INC. On that date, Plaintiff claims that a towline connected between the Barge and an unidentified towing vessel broke or parted. He and other coworkers on the Barge were instructed by the OPI Barge Supervisor to manually retrieve that portion of the towline still attached to the Barge and haul it onto her deck. During this process, GRIFFIN sustained a back strain. He recovered from this injury within a very brief period of time and returned to full duty onboard the Barge. The Court finds that this injury was "de minimus", resulted in no permanent physical impairment or disability and gave rise to no damages.

9. At the time of his second injury, on November 10, 1992, the Plaintiff was also employed as a "Jones Act" seaman onboard the L/V PIPELINER V. The ownership of the Barge was the same as was the Plaintiff's employment status relative to OPI INTERNATIONAL, INC. on that date. Plaintiff was a "leaderman" assigned to supervise a barge crew of riggers. His immediate supervisor was the OPI Barge Foreman, Michael Voisin, Jr., from whom he took all of his work-related instructions on that day.

10. After having moved further inshore due to inclement weather on November 9, 1992, the Barge was again towed offshore on November 10, 1992 by the M/V MISS PATRICIA to a location in West Cameron Block 230 to resume underwater pipeline operations for OPI's customer. In general, while attempting to remove the towing bridle from the bow bitts of the Barge in concert with three OPI riggers (Troy Spinn, Jeff Fontenot and David

Moss), at the completion of the tow and while acting under direct orders to make this attempt issued by Michael Voisin, Jr., the Plaintiff claims that he sustained a severe injury to his low back.

11. The M/V MISS PATRICIA is a standard offshore towing vessel which was owned and operated by SMITH TOWING, INC. NORTH BANK had no ownership or operational interest or control over the M/V MISS PATRICIA on the date of this incident. Rather, it simply "brokered" the provision of this vessel on the occasion in question by way of the charterparty referenced above.

12. All factual information concerning the Plaintiff's injury of November 10, 1992 was supplied by the Plaintiff himself, OPI co-workers and/or OPI documents admitted into evidence. There is no evidence to indicate that the Captain and/or crew of the M/V MISS PATRICIA had knowledge of the occurrence of the Plaintiff's injury or were otherwise made aware of it at any time. Further, there is no evidence that management or other representatives of either NORTH BANK or SMITH TOWING were made aware of the Plaintiff's injuries at any time until some two (2) years later when, in late November/early December of 1994, NORTH BANK received a demand letter from OPI counsel for contractual defense/indemnity pursuant to the Charterparty.

13. Mr. Nelson LaCoste, Captain of the M/V MISS PATRICIA on November 10, 1992, was made available for live testimony at trial. However, prior to being called as a witness by NORTH BANK and SMITH TOWING, counsel for these parties represented to the Court and OPI counsel that this witness had no recollection of the events of that day and could therefore lend little or nothing of substantive factual benefit to these proceedings. Predicated on this representation, and without objection by OPI counsel, the testimony of Captain LaCoste was not taken. The Court noted then and specifically finds now that absolutely no adverse inference will be drawn against NORTH BANK or SMITH TOWING by virtue of the absence of Captain LaCoste's testimony in this case. Given the lack of contemporaneous notice to the M/V MISS PATRI-CIA of even the occurrence of the Plaintiff's injury and the passage of over two years before the incident was in fact brought to the attention of NORTH BANK and SMITH TOWING representatives, it is completely understandable that Captain LaCoste has no recollection of his Tug's activities on that date.

14. Evidence of weather conditions at the time of Plaintiff's November 10, 1992 injury appears to be relatively consistent. OPI Tower Logs for November 10, 1992 (part of OPI Exhibit No. 39) reflect winds at 20–30 miles per hour out of the southeast and waves at 5 to 7 feet. The readings were recorded at Noon, shortly before Plaintiff's accident. The OPI Daily Job Report for November 10, 1992 (NORTH BANK/SMITH Exhibit No. 13) contains identical wind/sea data. The OPI First Report of Injury or Illness (OPI Exhibit No. 48) lists prevailing conditions of 5 to 7 foot seas, winds out of the southeast (speed not listed) and current direction out of the southeast (speed not listed). No credible evidence disputes these various entries. Accordingly, the Court finds that weather conditions at the time of the accident included seas of 5 to 7 feet, winds out of the southeast at 20 to 30 miles per hour and current of unknown speed out of the southeast as well.

15. No witness or documentation supplied the compass headings of the M/V MISS PATRICIA or the Barge at any relevant point prior to, at the time of or immediately following the occurrence of the Plaintiff's injury.

16. The time of Plaintiff's accident and its relationship to other activities is also in dispute. The Plaintiff was not specifically aware of the time of his injury. He testified that he did not report this incident immediately, but rather waited until after the towing bridle was successfully released. At that time, he sought out Barge Foreman Michael Voisin, Jr. to determine which barge anchors the Barge Foremen wanted run. Only then did the Plaintiff report for the first time that he had been injured during the initial (unsuccessful) towing bridle release process. The OPI Tower Log for November 10, 1992 (part of OPI Exhibit No. 39) contains the following significant entries:

1230 hrs—MISS PATRICIA shortening up tow line.

1320 hrs—Port stern on bottom. Towing ahead to drop port bow anchor.

1330 hrs—Port bow on bottom. Taking tow line off barge.

1345 hrs—Leaderman Jimmy Griffin pulled muscle in back while taking tow line off barge. Seen by medic.

1455 hrs—Barge set up. Diver down. ...

OPI provided no evidence to prove that the time of accident noted in its Tower Log was the actual time of accident rather than the approximate time of reporting of same by the Plaintiff.

17. Standard procedure for this type operation calls for a tug to tow the barge to location on a towline as long as 1,000 feet. The component parts of the towing apparatus (from the barge bow forward) consists of a two-legged towing bridle with factory eyes placed over the barge's bow bitts. Each bridle leg measures approximately 40 to 60 feet long and is constructed of one-inch steel cable. The "Y" of the bridle is attached to a heavy steel shackle which likewise connects to a softline or springline usually doubled and measuring approximately 20 feet in length after doubling. The springline is in turn attached with another steel connector to additional towing cable measuring 1 to 1½ inches in diameter which extends forward to the drum of the towing winch positioned on the tug's stern deck.

18. In general, upon arrival at an offshore work location, the Barge Foreman will communicate with the tug via a hand-held radio and advise when the barge is in an appropriate location for work. The positioning of the barge is determined by the Barge Foreman and is dictated to some extent by the position of the pipeline and underwater work to be performed by the Barge. This combined positioning and decision-making process by the Barge Foreman can place the tug in cross or angular seas and winds. In that respect, the tug is at the mercy of the Barge Foreman, his desired positioning of the barge and the elements. Towline shortening may begin shortly after arrival on location or be deferred until initial remote barge anchor deployment, if any, as discussed below.

19. At this juncture, the Barge Foreman makes a barge command decision on whether none, one, or more anchors will be dropped. Once readied on deck by the barge crew, the anchors are deployed via remote control operated by the barge anchor tower operator on instructions of the Barge Foreman. The number of anchors, if any, and the order of deployment are determined and controlled exclusively by the Barge Foreman, not the tug.

20. Once the initial barge anchor deployment, if any, is accomplished, the Barge Foreman will advise the tug to either commence or continue shortening of the towline. Under ordinary circumstances and conditions, the tug will continue to retrieve the towline until all portions of the towing apparatus, including the springline and bridle shackle, are on the tug's deck (i.e., to the "Y" of the bridle). The tug will then back briefly in order to create slight slack in the bridle. Once in this position, the tug will communicate with the Barge Foreman via radio, P.A. system or hand signal in order to confirm that the tug is in proper position for the tow line to be released from the barge's bow bitts by the barge leaderman and riggers. With the tug in this position, little weight/strain exists on the towing bridle eyes attached to the barge bitts. Under these circumstances, it is a relatively simple process for the leaderman and barge riggers (two people on port/two people on starboard) to remove the eyes from the barge bitts and simply drop them in the water, to be retrieved by the tug. The Court finds that under the conditions of this *standard* procedure, four (4) barge crewmembers are sufficient for safe bridle removal.

21. As the barge moves on to location and during the barge setup/tow bridle release process, the Barge Foreman should maintain a constant position at or near the anchor control tower on the heliport of the barge. In this elevated position, he will have a clear, unobstructed view of his workers on the bow of the barge, the towing cable/bridle, and the tug's position at any point in time. In addition, he will be able to ascertain and monitor the wind, sea and other relevant weather

conditions. This is the preferred position for the Barge Foreman to issue barge command decisions and to take early corrective measures in the event they become necessary.

22. Moving from general procedures to the date of accident, the Court notes that the testimony of the Plaintiff and that of the other OPI witnesses, as well as the OPI documentation submitted into evidence is divergent and highly conflicting. Out of this confused state of affairs, two (2) possible factual scenarios appear to emerge. The first is supplied by the Plaintiff who states that as the barge arrived on location, the M/V MISS PATRICIA began spooling up the towing cable as usual. At some point well before the MISS PATRICIA had spooled up a normal amount of cable, she radioed the Barge Foreman and advised that the weather was too rough and that no additional retrieval of cable would be attempted at that time. The Plaintiff was able to hear this radio communication via a hand-held radio which he carried at all times. This hand-held radio likewise enabled the Plaintiff to communicate with the Barge Foreman as matters progressed.

Shortly thereafter, the Plaintiff received radio instructions from the Barge Foreman to gather his riggers, proceed to the bow and attempt to release the towing bridle. On arrival at the bow, GRIFFIN noted that the MISS PATRICIA was positioned a considerable distance away from the barge and some distance to port. Although these distances could not be estimated by him, it is clear that the towing bridle, shackle, springline, connector and some length of additional towing cable extending toward the MISS PATRICIA were separating the two vessels at that time.

Concerned by the fact that he had been ordered by the Barge Foreman to attempt bridle release when the MISS PATRICIA clearly had not spooled up to its normal release position and had not given any indication that it was ready for bridle release, and concerned about the visible weight/strain on the bridle eyes attributable to the length of towing apparatus still out, the Plaintiff radioed the Barge Foreman and advised that he did not believe he and his three (3) riggers could remove the bridle under those conditions. The Foreman immediately responded by radio and instructed the Plaintiff to "try anyway". GRIFFIN and the riggers complied, with two men manning each eye. During the initial attempt, the Plaintiff assumed an awkward, but the only available, lifting position under the circumstances (discussed further below) and began pulling on one of the eyes of the bridle in combination with Troy Spinn, in an effort to release it. During this process, he felt extreme pain in his low back at which time he stopped the attempt.

GRIFFIN then radioed back to the Barge Foreman and advised that the bridles could not be released. He did not report his injury at that time. The Barge Foreman instructed the Plaintiff to vacate the bow with the riggers as he intended to have the tug reposition and/or spool up additional cable before further bridle removal attempts were made. OPI's safety policy dictates that the bow should be cleared of personnel at any time while the towing cable is in or subject to a strain. Voisin, Jr. then called the tug and asked it to reposition and spool up additional cable. Ultimately, this was accomplished (time estimates vary up to two hours) with the tug spooling up to the bridle "Y" as normal, and confirming its position for release. At that point, the Barge Foreman advised the Plaintiff and the riggers to proceed forward for bridle release. The Plaintiff complied and the bridle was released by him and the three (3) original personnel involved in this project. Plaintiff then proceeded to the stern of the barge to locate the Foreman in person and determine which barge anchors were to be deployed and in what order. After several minutes, he finally located the Barge Foreman at which time he made the initial report of his injury and was instructed to proceed to the medic's office for examination.

23. Plaintiff's testimony is significant in several key respects. First, he states that at no time prior to his injury had any barge anchors been deployed (remotely or otherwise) off the stern and, more importantly, off the bow of the Barge. Having a clear, unobstructed view of the water between the tug and Barge at all relevant times, the Plaintiff

testified that there was nothing in the water to create a risk of fouling for the tug. In Plaintiff's opinion, there was no emergency developing or underway prior to the time of his accident which necessitated premature attempts to release the towing bridle. The tug was not in fear of fouling barge anchor cables as none were in the water. Even if one had been deployed off the port bow, the Plaintiff's testimony distinctly indicates that the tug's distance from the bow was such that this anchor cable could not have constituted a fouling hazard. Further, the Plaintiff testified that the position of the towing cable itself in relation to the tug did not present a fouling hazard. Next, the Plaintiff testified that the Barge Foreman gave no indication to the tug at any time that he (Voisin, Jr.) felt the tug was about to foul the anchor cable. More importantly, Voisin, Jr. made no attempt to have the tug reposition or spool up additional cable after having been initially advised by the Plaintiff (before his injury) that Plaintiff did not think the bridle could be released, and prior to the Barge Foreman repeating the instruction to "try anyway". Further, the Plaintiff testified that the tug never issued any advices indicating that it was in or felt that it was in proper position for towing bridle release or that it was in need of bridle release (regardless of its positioning) in order to avert a developing or pending emergency situation. Even had the tug issued such advices, the Plaintiff testified that he acts only on instructions of his Barge Foreman. Therefore, the Court finds that GRIFFIN's actions in attempting to release the towing bridle at the time of his injuries were not influenced by any advices or requests from tug personnel, but were solely based on his Barge Foreman's instructions.

24. Further, the Plaintiff testified, and diagrams of the Barge introduced into evidence confirm, that the bow bitts are positioned extremely close to the bow of the Barge—approximately 6 inches from the edge. Each bitt set is doubled (two posts), running port and starboard and is fronted by a handrail running across the bow. Configured in this manner and with the weight/strain of the towing cable causing the eyes of the bridle to press hard against the back (stern) side of the involved bitts, it was virtually impossible for a worker to obtain a safe lifting position in order to effect bridle release. Rather, the worker must position himself behind the bitt, stoop over the bitt, grab the open splice or factory crimp and pull it backwards and upwards in an attempt to create sufficient slack to release the eye from the bitt. This exposes the worker's back to undue and unsafe lifting stress.

The Court finds that the bow bitt configuration is not reasonably fit or suitable for its intended and foreseeable purpose and constituted a work hazard to barge crewmembers engaged in bridle release under these circumstances. This unseaworthy condition was a proximate/legal cause of the Plaintiff's injuries.

Further, the Court finds that the Barge is equipped with air tuggers, mechanical devices which could have been rigged to remove the bridle eyes on this occasion, and thereby eliminate the need for manual lifting/release. The Barge Foreman knew or should have known of the excess weight/strain on the bridle eyes when he sent the Plaintiff and riggers forward to attempt the initial release. His failure to properly analyze the situation and conditions of the worksite, his failure to provide a safe place to work, his failure to properly supervise, his failure to assign additional riggers to the bridle removal task under the existing circumstances, his failure to issue more detailed precautionary instructions and his failure to employ mechanical means to effect bridle release under the circumstances each constitute negligence which was a proximate and legal cause of the Plaintiff's injuries. Further, the insufficiency in number of the assigned rigger crew and the Barge Foreman's overall incompetence in handling (mishandling) this situation constitute unseaworthy conditions which were each proximate and legal causes of the Plaintiff's injuries.

25. Finally, the Plaintiff unequivocally testified that nothing the tug or its crew did or failed to do caused or contributed to his injuries. In his opinion, all fault was attributable to the OPI Defendants and the Barge.

26. The second possible factual scenario stems primarily from testimony of Barge Foreman Michael Voisin, Jr. This witness testified that he was positioned atop the Barge heliport as she moved onto location. He made all decisions and issued all instructions relative to the pre-bridle release deployment of barge anchors including the number of anchors to be deployed, which anchors to deploy, the sequence of deployment and post-deployment adjustment, including the length of anchor cable. In addition, Voisin, Jr. made all decisions and issued all instructions relative to the method, manner and timing of attempted release and ultimate release of the towing bridle.

This witness testified that as the tug and Barge arrived on location at West Cameron 230, he first advised his anchor tower operator to remotely deploy the Barge's port stern anchor. After the port stern anchor cable was "paid out" to some extent, Voisin, Jr. ordered the port bow anchor remotely deployed. He then adjusted the two anchor cables in order to further position the barge as he saw fit. At or about the same time, Voisin, Jr. contacted the Plaintiff and advised him to proceed to the bow with his riggers for bridle release. The Plaintiff and riggers complied and made an unsuccessful attempt at release. GRIFFIN then radioed Voisin, Jr. to advise that the first release attempt was unsuccessful, but did not report his injury at that time. Voisin, Jr. then (for the first time) radioed the tug and requested that it reposition and spool up additional cable. The tug complied over a period of the next several minutes (time frame not specified). Upon achieving its normal position at the "Y" of the bridle and confirming same to the Barge Foreman, Voisin, Jr. then recontacted GRIFFIN and advised him to again attempt bridle release. Plaintiff and the three (3) riggers did so successfully on this occasion. Later, the Plaintiff and Voisin, Jr. met on another section of the barge at which time the Plaintiff made his first report of injuries to Voisin, Jr.

27. When Voisin, Jr. first instructed the Plaintiff and his riggers to go forward to the bow and attempt bridle release, he stated that the tug was some distance from the bow of the Barge and off to port, clearly not in its normal position for release and with considerable towing apparatus separating the two (2) vessels. Although there is abundant evidence to support the fact that Voisin, Jr. either knew or should have known that the relative positions of the vessels together with additional towing cables separating the two would place significant additional weight/strain on the bridle eyes over the barge bitts, there is no evidence to indicate that Voisin, Jr. even considered assigning additional riggers to assist in the initial manual release attempt or utilizing mechanical means. Further, the tug had not communicated confirmation of its position or other indication of readiness for bridle release at that time. Voisin, Jr.'s only explanation for his unquestionably premature and unsafe instruction to the Plaintiff and others was that he was concerned that the tug might foul the Barge's port bow anchor cable, noting that this could "cause him trouble" and "cost his company (OPI) money". The Court finds this "explanation" by Voisin, Jr. to be without merit for several reasons:

(a) No other witness in this case (except OPI rigger Troy Spinn—discussed below) provided evidence that any barge anchors were deployed from the bow or any other portion of the Barge prior to or at the time of the first (unsuccessful) bridle release attempt which caused the Plaintiff's injuries;

(b) OPI Rigger Troy Spinn agreed that both a port bow and port stern anchor had been deployed from the Barge before the Plaintiff's accident. However, he testified that the tug was positioned forward and to the *starboard* side of the Barge on his approach to the bow as well as at all times during and through the first (unsuccessful) bridle release attempt. Based on the testimony of this witness, Voisin, Jr. could not have been in fear of the tug fouling the Barge's port bow anchor, unless it had been horribly mispositioned by him in the first instance or had been negligently allowed by him to move into the reverse path of the tug during the spooling up process;

(c) Although OPI Rigger Jeff Fontenot did not testify, his recorded statement, taken on December 2, 1992 (NORTH BANK/SMITH TOWING Exhibit No. 46) was admitted into evidence and indicates that neither he nor coworker/rigger David Moss had any trouble releasing their side of the bridle. Although he acknowledged that the Plaintiff and Troy Spinn were having some difficulty on the opposite side, he stated that the problem was resolved before he could proceed to the other side of the Barge to lend a hand. During the entirety of that time, this witness stated that the tug was straight in front of the barge. Fontenot made no mention of anchors in the water at any position, of any potential problem with fouling of anchors, of tug misalignment or of any other problems related to the tug operations which could have caused or contributed to the Plaintiff's injuries;

(d) Similarly, the third OPI Rigger, David Moss, did not testify. However, his investigative statement, taken on December 12, 1992 was also admitted into evidence (NORTH BANK/SMITH TOWING Exhibit No. 47). Accordingly to his understanding, neither the Plaintiff nor any of the riggers had any apparent problems in releasing the towing bridle. At all relevant times, the tug was positioned midways between the port and starboard sides of the Barge. Moss has no recollection of the tug having to be repositioned in order to effect bridle release. Like Fontenot, Moss makes no mention of anchors in the water at any position, potential problems with fouling of anchors, tug misalignment or any other problems related to the tug operations which could have caused or contributed to the Plaintiff's injuries;

(e) The Court finds that had Michael Voisin, Jr. sincerely believed that the tug was out of position such that it was in fear of fouling the Barge's port bow anchor cable, common sense and supervisory experience would have dictated that he employ various other corrective measures before prematurely sending the barge crew forward to attempt bridle release under virtually impossible physical circumstances. First, he could have and should have contacted the tug and requested that it reposition itself and spool up additional towing cable. Voisin, Jr. made no such request. In fact, he admits that he never communicated his supposed fears to the tug or requested any corrective action by the tug prior to instructing the leaderman and riggers to attempt the initial (unsuccessful) release. Further, Voisin, Jr. admits that he never received any call from the tug indicating that it believed a risk of anchor cable fouling or other emergency situation was about to occur or was underway. Second, either singularly or in combination with a call to the tug, Voisin, Jr. could have and should have instructed his anchor tower operator to "pay out" on the Barge's port bow anchor, thereby allowing the anchor cable to drop lower in the water, beneath the level of the tug's screws, eliminating the risk of fouling. No such instruction or direction was issued by Voisin, Jr. Further, the court expressly finds that the M/V MISS PATRICIA did not foul the Barge's port bow or any other anchor cable before, during or after the Plaintiff's injuries;

(f) As noted above, OPI has an established safety policy which requires the crew to vacate the bow when the towing cable is under tension, thereby mitigating against the risk of injury should the towing cable or any of its component parts break or part at a connection point. The same safety logic holds true with respect to a deployed anchor cable under tension, particularly with a tug in the immediate vicinity with a perceived risk of fouling. Had Voisin, Jr. truly believed that the tug was about to foul the port bow anchor cable, thereby potentially cutting it while under tension, the last thing he would do is send his leaderman and riggers to the bow, directly into the zone of danger, in order

to attempt release of the towing bridle under physical conditions when it would be virtually impossible to do so. Nevertheless, Voisin, Jr. heartily agrees that he did send the leaderman and riggers forward under these exact circumstances;

(g) The Court finds that each of the acts/omissions of the Barge Foreman referenced in this section was negligent and a proximate/legal cause of the Plaintiff's injuries. The Court further finds that each such act or omission (as well as others discussed below) supports the Court's finding that Voisin, Jr.'s "explanation" of his highly premature release order is untenable and therefore incredible.

28. There is no evidence in the record to support a finding that even if the tug was out of alignment at the time of the Plaintiff's injuries, that it achieved its position by some negligence or substandard conduct on its part:

(a) The Court finds that the M/V MISS PATRICIA was properly manned and equipped on the date of the accident and was mechanically sound at all material times with respect to its steering and propulsion systems as well as with respect to the towing winch and all other equipment and appurtenances of the vessel necessary to safely and properly perform the job at hand;

(b) The Court finds that the tug was outfitted with Kortz nozzles on the date of the accident. These appurtenances, which surround the wheels of the tug, have a two-fold purpose—to increase power/performance and to mitigate against, if not eliminate, the chance of fouling steel cables of the size used for both barge anchor deployment and barge towing. The Court further finds that OPI management had actual knowledge of this feature of the tug on the date of incident. Voisin, Jr. testified that he was unaware of this feature of the tug on the date of the accident, despite the fact that the tug had been used for several days on this job and on various other occasions.

Even under Voisin, Jr.'s alleged version of facts, this knowledge should have allayed his alleged fears of port bow anchor cable fouling and should have caused him to act and issue instructions regarding bridle release in a *manner more consistent with the safety* of his crew. Voisin, Jr.'s failure to familiarize himself with these characteristics of the tug prior to GRIFFIN's injury was negligent and was a proximate/legal cause of the Plaintiff's injuries. As the record likewise demonstrates that OPI management was aware of this characteristic of the tug before the accident, if OPI management failed to inform Voisin, Jr. of this fact, as he suggests, then this omission by OPI management likewise constitutes negligence which was a proximate/legal cause of the Plaintiff's injuries;

(c) Voisin, Jr. testified that the winds/seas on approach to the work site and at the time of first attempted (unsuccessful) bridle release were striking the tug and Barge on their respective starboard sides. Knowing this fact, knowing that the tug would necessarily be backing during the tow cable spooling up process and thereby subjected to crosswinds and seas which would have the clear effect of driving the tug to her (and the Barge's) port, Voisin, Jr. nevertheless claims to have ordered remote deployment of the port bow anchor cable, thereby creating the possibility of the tug's conflict with that anchor cable, the exact conflict which he later claims he was seeking to avoid by issuing a premature instruction to release the towing bridle. This port bow anchor deployment, if it occurred, constituted negligence on the part of OPI under the circumstances and was a proximate/legal cause of the Plaintiff's injuries;

(d) Voisin, Jr. testified at his deposition that in retrospect, it would have been more prudent to remotely deploy starboard anchors prior to bridle release under the existing wind and sea condi-

tions. At trial, he made a weak, unsubstantiated attempt to retract this testimony. The Court declines to accept the retraction and believes that the original testimony of this witness on this issue was correct if one believes his version of events in the first instance. Accordingly, Voisin, Jr.'s error in deploying the wrong anchors, if any, from the Barge prior to towing bridle release was negligence on the part of OPI which was a legal/proximate cause of the Plaintiff's injuries; and

(e) Further, Voisin, Jr. admitted that it was equally possible that the tug, on approach and during all times up to and including the occurrence of Plaintiff's injuries, maintained a constant, proper heading and alignment, whereas the Barge, upon dropping one or more anchors, may have spun due to winds and seas into a different position herself which created the appearance of tug misalignment. The Court accepts this possibility and finds that if it occurred, tug positioning under these circumstances clearly would have been proper and non-negligent.

29. The Court finds under the circumstances of this case that it was not foreseeable by the tug, even if it were out of normal position for bridle release, that the Barge Foreman would issue a premature instruction to the leaderman and Barge crew to attempt release of the bridle when he did. Even if the tug somehow learned of the intended premature release shortly before its actual execution, the Court finds that there is nothing the tug could have done to materially mitigate against or eliminate the risk or occurrence of injury to the Plaintiff under those circumstances.

30. OPI's allegation of tug causation and/or negligence was not assisted by its liability expert, Captain R.J. Underhill. Although Captain Underhill has held assorted vessel operation licenses for decades and has significant experience in relation to various maritime activities (and is an utterly charming individual), he is not specifically qualified to testify in a case of this nature. The Captain admitted that he had never served as a master or crewmember on any sort of towing vessel. Accordingly, and except for a fascinating World War II "sea story," he had no hands-on experience in towing operations, whether involving lay barges or other marine equipment. His only experience in towing activities was limited to four to five occasions over the past several years when he attended onboard the barge or vessel in tow. Of these isolated occasions, the Captain could relate the purpose of his job assignment on only one—that being to certify the cranes onboard the towed vessel, a task clearly unrelated to proper towing procedure, barge setup on location or towing bridle release.

Further, although Captain Underhill clearly stated in his initial (and only) written report issued in this case that "Mr. Griffin contributed 100% to his own injury", he attempted to ascribe some ill-defined portion of causation and/or negligence to the tug at trial while at the same time professing that OPI was wholly without fault. Aside from his clear lack of expertise in the relevant areas of liability inquiry in this case, the Court finds that Captain Underhill's opinions were based in large measure on supposition and his impression of what proper towing and related procedures should be, as opposed to analysis of actual testimony and documentation presented to him for review in his "expert" capacity. In addition, the Court finds that this witness was presented with only select portions of the pretrial investigation and discovery necessary to form credible opinions. By way of brief singular example, his report and testimony does not reveal that he was furnished with the statements of Riggers Jeff Fontenot and David Moss prior to his trial testimony. From that which he did review, it appears that Captain Underhill extracted isolated bits and pieces of testimony from various witnesses which he perceived to be most favorable to his opinions in the case and chose to exclude or ignore other bits and pieces (often from the same witnesses), all without credible explanation or justification. At one point in his testimony, Captain Underhill attempted to suggest that his expert retention was limited solely to evaluation of the Plaintiff's comparative negligence, to the exclusion of tug and barge interests, therefore the express written con-

clusion of 100% fault attributable to the Plaintiff. Viewing the testimony of this witness as a whole however, this is clearly not the case as both his written report and live testimony were intimately concerned with the activities of both vessels and their causal relationship to Plaintiff's injuries. After carefully considering the entirety of the testimony of this witness, the Court lends no credence to Captain Underhill's opinions in this case as they relate to the presence of tug causation or tug negligence and/or the absence of barge/OPI negligence.

31. Further, the Court finds that the record is devoid of any other credible evidence of probative value which suggests or establishes causation or negligence on the part of the tug, its operations and/or its owners and operators. The Court finds that the tug was properly aligned and positioned at all times relevant to the Plaintiff's injuries. Alternatively, the Court finds that the tug's alignment and positioning at any relevant time did not cause or contribute to the Plaintiff's injuries. The Court notes that the burden of proof on the issue of tug causation and/or tug negligence lies with the OPI Defendants. Accordingly, the Court finds that the OPI Defendants have wholly failed in their burden of proof on these issues.

32. Perhaps the most significant evidence contradicting OPI's claims of tug causation or negligence lies in its own paperwork. The record contains three (3) separate sets of OPI logs for the date of injury (being the OPI Tower Log for November 10, 1992— part of OPI Exhibit No. 39/the OPI Daily Master's Log for November 10, 1992— NORTH BANK/SMITH Exhibit No. 15 and the OPI Daily Job Report for November 10, 1992—NORTH BANK/SMITH Exhibit No. 13). In addition, the record contains three (3) separate OPI accident reports in relation to this injury (being United States Coast Guard CG–2692—OPI Exhibit No. 50/the OPI Supervisor's Investigation Report for November 10, 1992—NORTH BANK/ SMITH Exhibit No. 50 and the OPI First Report of Injury or Illness for the incident of November 10, 1992—OPI Exhibit No. 48).

The Court notes that it is standard maritime procedure to log all accidents and injuries at or shortly after the time of their occurrence and to provide an explanation, however brief, as to the cause or causes of same. The Court further notes that of the three (3) OPI logs referenced above, only the OPI Tower Log for November 10, 1992 (part of OPI Exhibit No. 39) makes reference to GRIFFIN's accident and wholly fails to indicate that same was caused by or contributed to by tug operations, negligent or otherwise. Additionally, Voisin, Jr. testified that it is standard OPI policy to conduct an investigation into the facts of an accident shortly after its occurrence in order to determine cause and corrective measures so that additional injuries of the same or similar nature can be avoided in the future. The Court again notes that none of the OPI accident reports listed above contain any reference to the tug in relation to its positioning, navigation or otherwise give indication that the Plaintiff's injury was caused by or contributed to by tug operations, negligent or otherwise.

Indeed, it is significant to note that the OPI Supervisor's Report of Investigation (NORTH BANK/SMITH Exhibit No. 50) was reviewed and signed by Mr. Voisin, Jr. after his completion of an accident investigation conducted in concert with Barge Medic, Rick Hunter. This report contains a specific section on the Supervisor's investigation of cause including delineation of unsafe acts and contributory causes, calls for a full description of how the accident occurred and specifically what the employee was doing when injured (requesting that additional comments be attached, if necessary, to include the machine, tool or thing causing the injury). In addition, the report calls upon the investigator to explain specifically what has been done or is planned to prevent reoccurrences of this type accident in the future together with indication as to whether the action has been taken or is planned. The report concludes with a questionnaire concerning whether there was a "safe job procedure" (answered affirmatively in the report) and if there was, whether it was followed (again answered affirmatively in the report).

There is a marked absence throughout this and all other OPI accident reports concerning any criticism of tug activity or allegations

of tug causation, negligent or otherwise. Indeed, Mr. Voisin, Jr. admitted that he had no conversation with the Captain or crew of the M/V MISS PATRICIA following this incident wherein he informed them of even the existence of the injury, much less their alleged culpability in relation thereto. The Court finds it inconceivable that OPI would completely fail to document tug operations as a cause of Plaintiff's injuries, fail to even verbally advise the tug crew of the existence of an injury to one of the OPI crewmembers, fail to discuss with the tug crew corrective actions to be taken in the future, and fail to formally or informally place either of the tug-related Defendants on notice (of even the existence of the Plaintiff's injury) until over two (2) years after its occurrence (see OPI Exhibit No. 31), if OPI was sincere in its belief and allegations concerning the tug's involvement in this case.

■ 32(a). The issue of Plaintiff's comparative negligence is rendered moot under the circumstances of this case in view of the settlement referenced above. As between the remaining parties, the Court finds that OPI is 100% at fault for the Plaintiff's injuries (discussed further below) and SMITH TOWING is 0% at fault for the Plaintiff's injuries. The Court further finds that NORTH BANK can have no factual liability in this case due to its lack of ownership or operational control over the tug at the time of this incident.

33. Moving to the issues of contractual indemnity pursuant to the OPI International, Inc./North Bank Towing Corporation Charterparty of September 9, 1992 relative to the M/V MISS PATRICIA (OPI Exhibit No. 30), the Court notes that this issue was the subject of an extensive Motion and Cross–Motion for Summary Judgment by the remaining parties which gave rise to the Court's separate Order of February 6, 1995 denying both. Therein, the Court pointed out that the language of the Charterparty, admittedly authored by OPI, was a "model of poor draftsmanship" which did not on its face allocate the responsibilities of the parties with the kind of clarity and certainty that are the very point of indemnification clauses.

The Court now makes an express finding in this regard.

In attempting to assist the parties on a pre-trial basis with contract interpretation, the Court ultimately determined that the legal and factual issues were inextricably mixed, thereby precluding granting of Summary Judgment for either side as a matter of law. As such, the Court noted that a bench trial would afford both sides ample opportunity to present testimony relevant to the resolution of these issues. The trial having now been concluded, the Court makes the following findings relative to the contractual issues:

(a) First, the OPI Defendants, the parties who are claiming entitlement to contractual indemnity and coverage and who therefore have the burden of proof on these issues, chose to ignore the Court's invitation and wholly failed to present any evidence or testimony on these issues at trial. This default in and of itself now enables the Court to find, after consideration of the balance of the record, that the indemnity and insurance provisions of the contract are vague and ambiguous and are construed against the OPI Defendants, thereby disallowing indemnity to them in this case. However, the Court's reasoning does not stop here;

(b) NORTH BANK accepted the Court's invitation and proffered Mr. Charles Denning, Manager of NORTH BANK, to testify on contractual issues. In brief relevant summary, Mr. Denning testified that NORTH BANK had been doing business with OPI for a number of years preceding GRIFFIN's injury. The prior business relationship included provision of the M/V MISS PATRICIA on a "brokerage" basis on other occasions as well as provision of NORTH BANK owned and operated vessels. Earlier jobs involving the M/V MISS PATRICIA as well as NORTH BANK vessels had been conducted under other OPI charter forms. At some point prior to execution, Denning received the instant Charterparty by mail. After reading the Charter, he

was confused and did not understand the meaning or supposed intent of various sections of the Charter, including the indemnity and insurance provisions. He called OPI's office to discuss these issues, speaking with Mr. Al Warmager (Traffic/Operations Manager for OPI) and perhaps Cary Williams (in-house counsel for OPI). Mr. Denning received no explanation of OPI's intent or purported intent on the insurance, indemnity or other sections of the Charter and was not given an opportunity to "negotiate" the terms of the Charter relative to indemnity, insurance or otherwise. Rather, he was told that other boat contractors working for OPI were signing the subject charter form and that if NORTH BANK wanted to continue to work for OPI, it should do likewise—essentially a "take it or leave it" situation. In response to cross-examination by OPI counsel, Mr. Denning further testified that approximately 70% of NORTH BANK's overall business at this time was being supplied by OPI, thereby distinctly corroborating the pressure which was being applied to NORTH BANK to execute the instant Charter. Denning ultimately signed the Charterparty on September 9, 1992 without further explanation. He received no additional advices concerning intent or purported intent of OPI relative to indemnity or insurance issues in the Charter between the date of execution and the date of the Plaintiff's accident.

34. Predicated on the foregoing testimony and considering the record as a whole, the Court finds that there was no meeting of the minds between the OPI Defendants and NORTH BANK relative to the meaning of the insurance and indemnity clauses of the Charterparty at the time of execution or at any time prior to Plaintiff's injuries. The Court further finds that the facts and circumstances of this case lead to the determination that the subject Charterparty is a "contract of adhesion" which is void and unenforceable on its face. The Court independently finds that the Charterparty provisions are vague, ambiguous and not capable of a single rea-

sonable interpretation. As such, the indemnity provisions are strictly construed against the OPI Defendants, the author, and are found to be void and unenforceable, thereby affording no indemnity to the OPI Defendants in this case.

35. NORTH BANK asserted in its Cross-Motion for Summary Judgment that if the contract was capable of a reasonable interpretation, then its indemnity and insurance provisions should be read together in an attempt to harmonize the clauses and derive the true intention of the parties. As such, it advocated that if it was liable to indemnify OPI for OPI's own negligence, then the indemnity obligation (consistent with the insurance requirements) should include negligence of OPI only in its capacity or role as Time Charterer of the M/V MISS PATRICIA. While the Court remains unpersuaded by this interpretation of the clauses, it does make the following express findings in order to assist during appellate review, if necessary:

(a) Plaintiff's injuries were not caused or contributed to by the tug, its operations and/or its owners and operators, negligently or otherwise;

(b) Plaintiff's injuries were caused and contributed to by the negligence of OPI and the unseaworthiness of the Barge to the exclusion of the tug, its operations and its owners and operators. OPI negligence in this instance amounts to 50%. Similarly, Barge unseaworthiness in this instance amounts to 50%;

(c) All negligence heretofore found on the part of OPI arose in its status and role as owner/operator of the Barge and/or as Jones Act employer of the Plaintiff;

(d) None of the negligence heretofore found on the part of OPI arose in its status or role as Time Charterer of the M/V MISS PATRICIA;

(e) The insurance provisions of the Charterparty require NORTH BANK to name the OPI Defendants as additional assureds on a NORTH BANK P & I policy, but only in their capacity as Time Charterer of the tug. Plaintiff's

pleadings make no claim against any of the OPI Defendants in their status or role as the Time Charterer of the tug and the evidence otherwise fails to support any such allegations or findings. Therefore, there is no obligation on the part of NORTH BANK or its underwriters to provide the OPI Defendants with a defense under the P & I policy, either at the inception of this case or now; and

(f) Regardless of the interpretation of the indemnity agreement, the Court finds that it does not obligate NORTH BANK to indemnify the OPI Defendants for their liability in relation to unseaworthiness of the Barge. Therefore, even if the indemnity agreement were otherwise generally enforceable to some extent, it would not supply OPI with defense or indemnity benefits relative to Barge unseaworthiness.

## CONCLUSIONS OF LAW

1. At the time of his injury on November 10, 1992, the Plaintiff, JIMMY JOSEPH GRIFFIN was a "seaman" as that term is defined, employed by OPI International, Inc. This Court has jurisdiction over all claims made herein pursuant to 28 U.S.C. § 1333. Venue is proper in this District and Division.

2. The injuries sustained by Plaintiff, JIMMY JOSEPH GRIFFIN, on November 10, 1992, as described in the Court's Findings of Fact, were proximately caused by the negligence of the OPI Defendants and the unseaworthiness of the Barge. Such negligence and unseaworthiness were each a legal and factual cause of the Plaintiff's injuries. Correspondingly, the injuries sustained by the Plaintiff as described in the Court's Findings of Fact were not proximately caused by the negligence of the M/V MISS PATRICIA, its operations and/or its owner and operator, SMITH TOWING, INC. Further, neither the tug, its operations nor its owner and operator, SMITH TOWING, INC. were in any way responsible for causing the Plaintiff's injuries, even in the absence of negligence and legal/proximate cause. Consequently, the OPI Defendants are liable for the one half ($425,000.00) of the settlement amount ($850,000.00) agreed to in this case, which was paid directly to Plaintiff, and the OPI Defendants are also liable for reimbursement of the other half ($425,000.00) of the settlement amount ($850,000.00) which was paid by SMITH TOWING, INC. and NORTH BANK TOWING "without prejudice."

■ 3. The indemnity provisions of the subject Charterparty, when considered in conjunction with the balance of that document and the entirety of the record, completely lack the kind of clarity and certainty that are the very point of indemnification clauses; are vague, awkward and ambiguous; and are therefore strictly construed against their drafters, the OPI Defendants. For these reasons, the Court concludes that the indemnity provisions are void and unenforceable as a matter of law.

■ 4. The indemnity provisions of the Charterparty as well as the Charterparty as a whole constitutes a "contract of adhesion" with no meeting of the minds between the parties prior to and at the time of the execution of the contract concerning intent. Accordingly, the Court concludes on this basis that the contract, including its indemnity and insurance provisions, is void and unenforceable as a matter of law.

■ 5. The Court further concludes that the insurance provisions of the Charterparty are not triggered by the facts and circumstances of this case. Therefore, no defense or coverage is owed to the OPI Defendants under NORTH BANK's P & I policy or any other policy carried by it.

6. The OPI Defendants' claims for contribution and indemnity (contractual or otherwise) against NORTH BANK are **DENIED** in their entirety.

7. The OPI Defendants' claims for contribution and indemnity against SMITH TOWING are **DENIED** in their entirety.

8. NORTH BANK's and SMITH TOWING's claims for contribution from the OPI Defendants are conversely **GRANTED** in their entirety. NORTH BANK and SMITH TOWING shall therefore have and recover of and from the OPI Defendants their half

($425,000.00) of the settlement amount ($850,000.00) agreed to in this case.

9. To the extent any Finding of Fact constitutes a Conclusion of Law, the Court hereby adopts it as such. To the extent any Conclusion of Law constitutes a Finding of Fact, the Court hereby adopts it at such.

**IT IS SO ORDERED.**

### *FINAL JUDGMENT*

This action came on for trial before the Court, Honorable Samuel B. Kent presiding, on February 13 and 14, 1995. Plaintiff, JIMMY GRIFFIN's claims against all Defendants, including OPI INTERNATIONAL, INC., OFFSHORE PIPELINES, INC., OPI INTERNATIONAL VESSELS, LTD. and SMITH TOWING, INC., were settled during trial for $850,000.00 under a funding arrangement whereby the Defendants, OPI INTERNATIONAL, INC., OFFSHORE PIPELINES, INC., OPI INTERNATIONAL VESSELS, LTD. on the one hand and Defendant SMITH TOWING, INC. and Third–Party Defendant NORTH BANK TOWING CORPORATION, on the other hand, each paid $425,000.00. This settlement was without prejudice to all Third–Party Claims and Cross-/Counterclaims by the funding parties and with full reservation of rights of all such claims for further adjudication. Plaintiff's claims against the Defendants have been disposed of by a separate Final Judgment entered pursuant to Fed.R.Civ.P. 54(b). The Third–Party Claims and Cross-/Counterclaims of the Defendants and Third–Party Defendants above named and all issues related thereto having then been tried to conclusion, Findings of Fact and Conclusions of Law having been made, and a decision on all remaining Third–Party Claims and Cross-/Counterclaims having been duly rendered, such that OPI INTERNATIONAL, INC., OFFSHORE PIPELINES, INC., and OPI INTERNATIONAL VESSELS, LTD. are, jointly and severally, found liable for the full amount of the agreed settlement paid and/or to be paid to the Plaintiff, JIMMY GRIFFIN, in relation to his injury claim of November 10, 1992. This is subject to the right of SMITH TOWING, INC. and NORTH BANK TOWING CORPORATION to recover their one-half share ($425,000.00) of the agreed settlement ($850,000.00) from OPI INTERNATIONAL, INC., OFFSHORE PIPELINES, INC., and OPI INTERNATIONAL VESSELS, LTD.

It is therefore **ORDERED, ADJUDGED, and DECREED** that Third–Party Plaintiffs, OPI INTERNATIONAL, INC., OFFSHORE PIPELINES, INC., and OPI INTERNATIONAL VESSELS, LTD., take nothing from Third–Party Defendant, NORTH BANK TOWING CORPORATION by way of their Third–Party Complaint, which is hereby **DISMISSED WITH PREJUDICE** with each party to bear its own costs.

It is further **ORDERED, ADJUDGED, and DECREED** that Cross–Plaintiffs, OPI INTERNATIONAL, INC., OFFSHORE PIPELINES, INC., and OPI INTERNATIONAL VESSELS, LTD. take nothing from Cross–Defendants, SMITH TOWING, INC. by way of their Cross–Claim, which is hereby **DISMISSED WITH PREJUDICE** with each party to bear its own costs.

It is further **ORDERED, ADJUDGED, and DECREED** that SMITH TOWING, INC. recover 100% contribution from OPI INTERNATIONAL, INC., OFFSHORE PIPELINES, INC., and OPI INTERNATIONAL VESSELS, LTD. by way of its Cross–Claim against those parties and that NORTH BANK TOWING CORPORATION recover 100% contribution from OPI INTERNATIONAL, INC., OFFSHORE PIPELINES, INC., and OPI INTERNATIONAL VESSELS, LTD. by way of its Counterclaim against those parties, such that SMITH TOWING, INC. and NORTH BANK TOWING CORPORATION recover the sum of $425,000.00 (which they paid to Plaintiff directly, "without prejudice") from OPI INTERNATIONAL, INC., OFFSHORE PIPELINES, INC., and OPI INTERNATIONAL VESSELS, LTD., jointly and severally, together with post-judgment interest at the rate of four and a half percent (4.50%) per annum, for which execution shall issue if not timely paid. OPI INTERNATIONAL, INC., OFFSHORE PIPELINES, INC., and OPI INTERNATIONAL VESSELS, LTD. shall remain solely liable for their direct con-

tribution of $450,000.00 to the settlement of the Plaintiff's claim in the like amount.

**THIS IS A FINAL JUDGMENT. ALL RELIEF NOT HEREIN GRANTED IS DENIED. EACH PARTY SHALL BEAR ITS OWN COSTS.**